*This opinion is subject to administrative correction before final disposition.*

# United States Navy–Marine Corps
# Court of Criminal Appeals

Before
MONAHAN, STEPHENS, and DEERWESTER
Appellate Military Judges

_____

**UNITED STATES**
*Appellee*

**v.**

**Ali ALKAZAHG**
Private (E-2), U.S. Marine Corps
*Appellant*

**No. 202000087**

Argued: 22 July 2021—Decided: 7 September 2021

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judges:
Wilbur Lee (arraignment)
Ann Minami (trial)

Sentence adjudged 14 January 2020 by a general court-martial convened at Marine Corps Base Hawaii, Kaneohe Bay, Hawaii, consisting of a military judge alone. Sentence entered in the Entry of Judgment: 36 months' confinement, total forfeiture of pay, reduction to E-1, and a bad-conduct discharge.

For Appellant:
*Major Mary Claire Finnen, USMC* (argued)

For Appellee:
*Major Kerry Friedewald, USMC* (argued)
*Major Clayton Wiggins, USMC* (on brief)
*Captain Nicole A. Rimal, USMC* (on brief)

_____

## PUBLISHED OPINION OF THE COURT

————————————————

STEPHENS, Senior Judge:

Appellant was convicted, in accordance with his pleas, of one specification of fraudulent enlistment, two specifications of making a false official statement, and two specifications of possessing machine guns, in violation of Articles 83, 107, and 134 of the Uniform Code of Military Justice [UCMJ].[1]

Appellant raises two assignments of error. He argues first, the Government failed to state an offense when it alleged he possessed a machine gun,[2] because the "bump stock" he possessed did not meet the definition of "machinegun" under 26 U.S.C. § 5845(b), and second, that the military judge erred in failing to inquire into Appellant's understanding of the sentencing terms in his plea agreement. We find no prejudicial error in the military judge not inquiring into Appellant's understanding of the plea agreement.[3] However, we find the Government failed to state an offense when it charged Appellant with one specification of possessing a machine gun. We set aside and dismiss this specification and the segmented portion of the corresponding sentence. We reassess the unitary and segmented portions of the remaining sentence and conduct an analysis for sentence appropriateness. Finding all of the remaining segmented sentences inappropriate, we affirm the remaining findings and affirm the unitary portion of the sentence, but only affirm the remaining segmented portions of the sentence to the extent they are appropriate. We take action in our decretal paragraph.

————————————————

[1] 10 U.S.C. §§ 883, 907, 934.

[2] We use the modern spelling of "machine gun" except when quoting directly from 26 U.S.C. § 5854(b), which spells "machinegun" as one word.

[3] We have considered this AOE and find Appellant demonstrated good cause under Rule for Courts-Martial [R.C.M.] 902A(d) to change his election at arraignment for whether pre-MJA 16 or MJA 16 sentencing rules applied because it was a term of his subsequent plea agreement. *See United States v. Matias*, 25 M.J. 356, 363 (C.M.A. 1987).

## I. BACKGROUND

### A. The Bureau of Alcohol, Tobacco, Firearms, and Explosives Outlaws Bump Stocks

In October 2017, the nation was shocked, saddened, and outraged when a man opened fire on a large crowd attending a concert from his hotel room window in Las Vegas. The shooter killed approximately 60 people, wounded many, many more, and added fuel to the ongoing political debate on gun control. When it was revealed the shooter used a device called a "bump stock" to fire his semi-automatic rifles in a manner which nearly reproduced rates of fire for fully-automatic weapons, there were calls to outlaw these devices.

A bump stock allows a shooter to more easily conduct what is known as a "bump fire" on a semi-automatic rifle. In a semi-automatic rifle, one pull of the trigger initiates a trigger function that will only fire a single round of ammunition. In a fully automatic rifle, or machine gun, one pull of the trigger initiates a trigger function that continuously fires ammunition as long as the trigger is being pulled. A bump fire, aided by a bump stock, will closely resemble the firing rate of an automatic rifle. It does this by using the natural recoil of the weapon to engage the trigger. Instead of a shooter moving his finger to pull the trigger to fire a round, the stock of the weapon moves back and forth, or "bumps" the trigger against the shooter's trigger finger maintained in a pull position while the shooter also presses forward on the barrel or upper receiver with his non-firing hand.

Within days of the Las Vegas mass shooting, the President commented that the Executive Branch would be "looking into"[4] a ban on bump stocks. About a month after the shooting, a bill was introduced in Congress called the "Closing the Bump-Stock Loophole Act"[5] which would have effectively outlawed bump stocks by treating them in the same manner as a "machine gun"—or fully automatic weapons—which had, generally speaking, already been illegal since 1986 and heavily regulated for 70 years. This bill was never acted on by either the House of Representatives or the Senate, nor was any legislation ever passed outlawing bump stocks.

---

[4] On October 6, 2017, President Donald Trump made this remark from the Cabinet Room of the White House just prior to meeting with senior military leaders. *See* Speeches and Remarks, White House Press Office, https://web.archive.org/web/20171006131505/https://www.whitehouse.gov/the-press-office/2017/10/06/remarks-president-trump-meeting-senior-military-leaders.

[5] Closing the Bump-Stock Loophole Act, H.R. 4168, 115th Cong. (2017).

Instead, the President directed the Bureau of Alcohol, Tobacco, Firearms, and Explosives [ATF] to issue a new interpretation of a rule—that contradicted the ATF's previous interpretation—governing legislation from the 1930s. This Executive-Branch change in statutory interpretation aimed to outlaw bump stocks prospectively, without a change in existing statutes.

In 1934, Congress passed a bill and the President signed into law the National Firearms Act [NFA] to address automatic weapons (the weapon of choice for Chicago gangsters during Prohibition). The NFA imposed a significant tax on the importation and transfer of machine guns, which it defined as, ". . . any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically or semiautomatically, more than one shot, without manual reloading, *by a single function of the trigger*."[6] Congress amended this statutory language when it passed the 1968 Gun Control Act [GCA], which removed the word "semiautomatically" from the definition of machine gun and addressed parts that could be used to assemble a machine gun.

In 1986, Congress passed the Firearms Owners' Protection Act [FOPA], banning possession of machine guns not owned before 1986. FOPA also banned any parts, to include frames and receivers, which were part of a machine gun or were designed for converting a weapon into a machine gun.

The current statute at issue is 26 U.S.C. § 5845(b), which defines what a machine gun is. Due to having a bump stock, Appellant was charged under the statute which states that a machine gun is "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger."[7]

In 2002, William Akins invented a bump stock device, known as the "Akins Accelerator." He requested the ATF evaluate it to determine if it would be classified as a machine gun. One key difference from more modern bump stocks—including the one at issue in this case—was that the Akins Accelerator had an internal spring that created forward pressure on the weapon, rather than a shooter using manual pressure with the non-firing hand. Initially, the ATF did not consider the device to be a machine gun, because it defined the 1934 NFA's term "single function of the trigger" as a

---

[6] National Firearms Act of June 26, 1934, chs. 757, 758, 48 Stat. 1236–1240 (codified as amended in 26 U.S.C. 5801–5872 (2018)) (emphasis added).

[7] 26 U.S.C. § 5845(b).

"single movement of the trigger."[8] The Akins Accelerator relied on, and helped facilitate, rapid single movements of the trigger to produce the increased firing rate. In 2006, the ATF reversed course and decided the device "result[ed] in a weapon that shoots more than one shot, without manual reloading, by a single pull of the trigger[9] and was a machine gun as defined by the NFA and GCA.

Akins filed suit in federal district court and lost on summary judgment. In an unpublished decision, the U.S. Court of Appeals for the Eleventh Circuit affirmed, holding (1) the phrase, "single function of the trigger," means a "single pull of the trigger,"[10] (2) the ATF's interpretation was consistent with "the statute and its legislative history,"[11] and (3) that with "a single application of the trigger . . . the Accelerator uses its internal spring and the force of the recoil to fire continuously . . . ."[12] The court also held that using the word "function" instead of "pull" to "reference the action taken by a gunman to commence the firing process is not so confusing that a man of ordinary common intelligence would have to guess at its meaning."[13]

The classification of modern bump stocks,[14] which do not have internal springs and therefore require the shooter to keep constant forward pressure on the upper receiver while firing, has also been reconsidered by the ATF. Ten times between 2008 and 2017, the ATF classified bump stocks to be a firearm part and not a machine gun.[15] But in March 2018, in response to the President's direction in the wake of the Las Vegas shooting, the ATF published a notice of proposed rulemaking proposing to clarify the interpretations of "single function of the trigger" and "automatically."[16] The ATF's proposed clarification resulted in bump stocks being classified as machine

---

[8] Bump-Stock-Type Devices, 83 Fed. Reg. 66,514, 66,517 (Dec. 26, 2018) (to be codified at 27 C.F.R. 477, 478, 479).

[9] *Akins v. United States*, 312 Fed. App'x. 197, 199 (11th Cir. 2009).

[10] *Id.* at 200.

[11] *Id.*

[12] *Id.*

[13] *Id.* at 201.

[14] Unless otherwise indicated, references in this opinion to "bump stocks" refer to modern bump stocks.

[15] 83 Fed. Reg. at 66,517.

[16] Bump-Stock-Type Devices, 83 Fed. Reg. 13,442, 13,447 (proposed Mar. 29, 2019).

guns under 26 U.S.C. § 5845(b). In December 2018, the ATF's "Final Rule" concluded that bump stocks were machine guns and that owners must either destroy them or surrender them to the ATF by 26 March 2019.[17]

## B. Appellant Went on Leave to Nebraska

Appellant was stationed in Hawaii. On 22 May 2019 [about two months after the safe harbor to surrender bump stocks had expired] he was headed to the airport to go on leave to visit his foster parents in Nebraska. While a fellow Marine was driving him to the airport, Appellant's supervisory gunnery sergeant called to inform him he did not check-out properly. Appellant lied to the gunnery sergeant and told him his flight had been cancelled and re-scheduled for an earlier time. After getting off the phone, Appellant made comments to the other Marine that he would shoot up the shop if he got "more negative paperwork" because of the improper check-out.[18] The other Marine subsequently reported these comments to his unit. Appellant's unit responded by listing him in an unauthorized leave status and reported his threats of violence, which were communicated throughout the Department of Defense and to civilian law enforcement in the Defense Biometric Identification System [DBIS].

Appellant's leave destination was near Offutt Air Force Base [AFB] outside of Omaha. During his leave, Appellant had worked out a few times on base without having any problems at the gate. But around Appellant's tenth day of leave, he was stopped when he tried to enter the base. A gate guard saw Appellant was flagged in DBIS and ordered him to turn off his vehicle.

Appellant was detained, handcuffed, and asked if he had any weapons in his truck. Appellant, an avid firearms enthusiast, did have some firearms in his truck, but he initially lied and said "no." Within minutes, and prior to the search of his vehicle,[19] he told a security officer, an Air Force Technical Sergeant [E-6], that he did in fact have weapons in his truck. The search, conducted by the Air Force Office of Special Investigations [AFOSI], produced two pistols, one rifle, about 700 rounds of ammunition, body armor, a suspected silencer, and a bump stock. This discovery prompted the Naval Criminal Investigative Service [NCIS] and the ATF to become involved.

---

[17] Bump-Stock-Type Devices, 83 Fed. Reg. at 65,514.

[18] Pros. Ex. 13.

[19] The Record strongly implies this fact. The security officer's statement indicated Appellant confessed to having weapons in his vehicle. After this confession, the security officer stated, "At this time AFOSI agent arrived on scene." Def. Ex. A at 2.

The next day, ATF and NCIS agents visited the home of Appellant's foster parents.[20] Appellant's father gave the agents permission to search Appellant's room and closet. The agents found a shotgun and two devices known as "switches." A switch is a device, illegal under 26 U.S.C. § 5845(b), which makes semi-automatic pistols shoot automatically. One switch was found in a toolbox inside the closet and the other was inside a safe that was also inside the closet. Appellant's father gave the agents the combination to the safe and allowed them to open it. Appellant's parents told the agents they were unaware Appellant had ever made any threats or expressed any discontent with any of the people with whom he served. They described Appellant as a patriotic individual who believed the military was the correct path for his life, and who, prior to enlisting in the Marine Corps, had worked as a prison guard and a part-time interpreter for the Federal Bureau of Investigation [FBI].

NCIS agents took custody of Appellant, who was being held at Offutt AFB, and escorted him back to Hawaii where he was placed in pretrial confinement. The convening authority referred charges to a general court-martial about three-and-a-half months later.

## C. Appellant Pleaded Guilty, Conditionally, at a General Court-Martial

Appellant was arraigned in October 2019. At that Article 39(a) session, the military judge informed him that because the dates of some of his charged offenses occurred before 1 January 2019, he could elect to be sentenced under the sentencing rules in effect prior to the Military Justice Act of 2016 [MJA 16] taking effect. Appellant elected to be sentenced under the "old" [pre-MJA 16] rules.

### 1. The plea agreement

A few days after the arraignment, Appellant entered into a plea agreement with the convening authority. The convening authority agreed to dismiss some of the charges and specifications.[21] In exchange, among other

---

[20] At, "close to 17 years of age," Appellant, after being in many different foster homes, was taken into the home where he spent his leave. He "continued to live in [the] home until he became independent" and "continued [his] relationship" with his foster parents. R. at 287. We refer to them as his mother and father though they are not his biological parents or his adopted parents. Def. Ex. B.

[21] The convening authority dismissed (1) the unauthorized absence that started this chain-of-events [Article 86, UCMJ]; (2) violating a general order prohibiting the transportation of privately owned firearms aboard Offutt AFB, and dereliction of

things, Appellant agreed to be sentenced under the "new" MJA 16 sentencing rules, which was a reversal of his election made at his arraignment. He also agreed to plead guilty before a military judge alone to (1) a single specification of fraudulent enlistment in violation of Article 83; (2) two specifications of violating Article 107 by falsely telling his gunnery sergeant that his flight was cancelled and rescheduled for an earlier time, and for initially telling the security officer at Offutt AFB that he did not have any firearms in his vehicle; and (3) two specifications of violating Article 134 for illegally possessing a bump stock as defined by 26 U.S.C. § 5845(b) and two switches as defined by the same statute.

Appellant also agreed to forfeit to the Government a pistol, two rifles, his bump stock, and all of his other firearms, ammunition, body armor, tactical vests, holsters, suppressors, and magazines that were in the possession of either NCIS or ATF.

One provision of the plea agreement was underlined in the original document. Apparently, Appellant had made allegations of "racism, equal opportunity violations, and / or harassment"[22] against his command. The plea agreement required him to acknowledge that he did not provide the command the "necessary information" to investigate the allegations. The convening authority agreed to reduce the maximum confinement from 38 months to 36 months, but required Appellant to agree that any mitigation potential concerning his allegations was covered by this reduction, while acknowledging that this reduction was "in no way an admission by the Command that [the] allegations have merit, absent further information and investigation."[23]

Under the "new" sentencing rules, a convening authority and an accused may agree that certain punishments will be adjudged by the military judge. Here, the parties agreed that a bad-conduct discharge, total forfeitures, and reduction to E-1 would be adjudged. In addition, the plea agreement indicated that confinement, to be served concurrently, would be adjudged as follows:

---

duty for not properly checking out with his unit the day he left Hawaii [Article 92, UCMJ]; (3) making a false official statement by telling a first lieutenant that his platoon chain-of-command was aware he was checking out early for leave [Article 107, UCMJ]; (4) carrying concealed weapons on board Offutt AFB [Article 114, UCMJ]; and (5) making threats to shoot three named Marines and other unnamed Marines in his unit [Article 115, UCMJ].

[22] App. Ex. X at 10.

[23] *Id.*

fraudulent enlistment: 24 months,

lying to his gunnery sergeant about his flight: 24 to 36 months,

lying to the Offutt AFB security officer: 24 to 36 months,

possession of a bump stock: 24 to 36 months, and

possession of two switches: 24 to 36 months.

Finally, the plea agreement allowed for Appellant to conditionally plead guilty to possessing a bump stock. Appellant moved the military judge to dismiss that specification for failure to state a claim and preserved that same issue for appeal.

### 2. *The motion to dismiss and the guilty plea*

Appellant filed his motion to dismiss just after he signed the plea agreement. Generally, his argument was that the ATF invalidly interpreted 26 U.S.C. § 5845(b) to re-classify a bump stock as a machine gun. The Government argued the ATF's interpretation was valid and invoked "*Chevron* deference"—the deference courts give to agency determinations in resolving statutory ambiguity pursuant to the Supreme Court's landmark 1984 decision in *Chevron U.S.A. v. Natural Resources Defense Council, Inc.*[24]

At the motions hearing, the Defense presented the expert testimony of Chief Warrant Officer-5 Whiskey,[25] a retired Marine Gunner[26] who, at the time, worked as a consultant for a well-known arms manufacturer doing research and development testing. In his 30-year career, he had been a scout sniper, marksmanship instructor, completed several combat deployments, and served as a gunner—a special advisor to commanders on manning, training, and equipping infantry forces with a specialty in weapons—at the battalion, Marine Division, and Marine Expeditionary Force levels. He also served as the gunner for the Commandant of the Marine Corps. Gunner

---

[24] 467 U.S. 837 (1984).

[25] All names used in this opinion, except those of the judges, appellate counsel, Appellant, and those named in civilian cases are pseudonyms.

[26] A Marine Gunner has unique qualifications as compared to other Marine Corps Chief Warrant Officers in different military occupational specialty fields. In addition to wearing a "bursting bomb" device on one collar, they are customarily referred to as "Gunner" and are the only Marine Chief Warrant Officers who are properly given such appellation. Thus, we refer to the witness as Gunner Whiskey rather than Chief Warrant Officer-5 Whiskey.

Whiskey had worked with the FBI and the ATF and was familiar with the ATF rulemaking process. He was also familiar with bump firing and bump stocks.

Gunner Whiskey testified about the technique of bump firing a semi-automatic rifle. A shooter pulls the trigger, keeping his trigger finger rigid against it, holds the rifle stationary, and applies forward pressure with his non-firing hand. This causes the rifle's recoil energy to continue the rifle's firing mechanism of firing, extracting, chambering, and firing more rounds. A bump stock facilitates this by allowing the stock to slide, while the shooter keeps his trigger finger applied to the trigger and presses forward on the upper receiver. When asked if the "trigger is actually moving back and forth" during bump firing, Gunner Whiskey answered, "And the shooter cannot feel that, but yes, you're absolutely right."[27] When asked if "the trigger needs to move back and forth between each and every round?" he replied, "It does."[28]

Appellant argued the bump stock did not change the mechanics of the weapon and that a semi-automatic rifle equipped with a bump stock still fired only one round per single function of the trigger. Appellant also argued, among other things, that *Chevron* deference should not be applied to the ATF's interpretation because there is no statutory ambiguity to resolve. The military judge denied the motion.

**D. The Bump Stock Ban Has Been Litigated in Civilian Courts**

The ATF ruling was immediately the subject of litigation in various civilian courts. Such litigation is expected to continue, possibly to be resolved by the Supreme Court. There have been a handful of challenges to the ATF rule in the United States Court of Federal Claims and in federal district courts under the Takings Clause, none of which has generated a final appellate decision.[29] Generally speaking, when the government prevailed, it did so

---

[27] R. at 68.

[28] *Id.*

[29] *Cargill v. Barr*, 502 F. Supp. 3d 1163 (W.D. Tex. 2020); *Hardin v. Bureau of Alcohol*, 501 F. Supp. 3d 445 (W.D. Ky. 2020); *Modern Sportsman, LLC v. United States*, 145 Fed. Cl. 575 (2019) (argued before the U.S. Court of Appeals for the Federal Circuit in December 2020); *McCutchen v. United States*, 145 Fed. Cl. 42 (2019); *Lane v. United States*, No. 19-CV-01492-X, 2020 U.S. Dist. LEXIS 54545 (N. Dist. Tex. Mar. 30, 2020) (unpublished). *See also*, *Maryland Shall Issue v. Hogan*, 963 F.3d 356 (4th Cir. 2020) (based on Maryland's state ban on bump stocks), *cert. denied*, ___ U.S. ___, 209 L. Ed. 731 (May 3, 2021).

based on *Chevron* deference. In one case, a plaintiff prevailed (*Lane v. United States*[30] in the Western District of Texas), but the government was allowed to refile a motion to dismiss.

Three cases have resulted in federal appellate opinions from the Tenth Circuit, the District of Columbia Circuit, and the Sixth Circuit, but they all relied on *Chevron* deference or grappled with whether *Chevron* deference was appropriate in criminal cases. It is fair to say that the various circuit judges are not unanimous in their views on *Chevron* or the ATF's interpretation of the statute.

*1.* Aposhian v. Wilkinson*, U.S. Court of Appeals for the Tenth Circuit*

Clark Aposhian lived in Utah and owned a bump stock. Prior to the bump stock ban taking effect, he filed suit in federal district court, seeking a preliminary injunction against the United States. He argued that he was being unlawfully deprived of his property. The district court denied his motion.[31] Aposhian appealed. Initially, a three-judge panel of the Tenth Circuit affirmed the district court's judgment, though with a dissent.[32] The panel held that the statute was ambiguous, and applied *Chevron* deference in favor of the United States. Just four months later, the en banc Tenth Circuit vacated the panel opinion, ordered a rehearing, and directed the parties to address the Final Rule and how *Chevron* applies to criminal statutes.[33] But then in a reversal of its reversal, the en banc court vacated its earlier ruling as improvidently granted and reinstated its initial panel opinion affirming the district court.[34] Five of the eleven judges dissented, with four of them authoring dissents. The overarching theme of the dissents was whether and how *Chevron* deference ought to be applied.

2. Guedes v. BATFE*, U.S. Court of Appeals for the District of Columbia Circuit*

In the District of Columbia, some plaintiffs—a combination of individuals and firearms advocacy groups—also sought a preliminary injunction against the implementation of the Final Rule. In this litigation, the case went from

---

[30] 2020 U.S. Dist. LEXIS 54545.

[31] *Aposhian v. Barr*, 374 F. Supp. 3d 1145 (D. Utah 2019).

[32] 958 F.3d 969 (10th Cir. 2020).

[33] 973 F.3d 1151 (10th Cir. 2020).

[34] *Aposhian v. Wilkinson*, 989 F.3d 890 (10th Cir. 2021).

the district court,[35] to the United States Court of Appeals for the District of Columbia Circuit,[36] to the Supreme Court, which denied certiorari, but issued a cautionary note from Justice Gorsuch—who plainly stated that *Chevron* "has nothing to say about the proper interpretation of the law before us"[37]— and then back down to the district court, which again found for the government.[38]

At the District of Columbia Circuit, the majority relied on *Chevron* to hold that the ATF's reading of the ambiguous statute was permissible. The dissent argued that *Chevron* did not apply and reviewing de novo, would have found that the ATF read the rule correctly concerning "single function of the trigger" but incorrectly concerning "automatically."

At trial, despite Justice Gorsuch's cautionary note, the District Court for the District of Columbia applied *Chevron* and granted the government's motion for summary judgment.

*3.* Gun Owners of America v. Garland, *U.S. Court of Appeals for the Sixth Circuit*

In the Western District of Michigan, three gun rights organizations, two individuals who owned bump stocks, and one prospective purchaser, also sought a preliminary injunction to prevent the Final Rule from taking effect. The district court denied the motion for an injunction because the Final Rule was a "permissible interpretation" of the statute.[39] A panel of the Sixth Circuit held that the district court erred in allowing the government to have the benefit of *Chevron* deference in a criminal statute and that the ATF's Final Rule was not the best interpretation of the statute.[40]

The panel's majority opinion argued that *Chevron* deference was not warranted for three reasons: (1) because criminal laws reflect the moral outrage of a community, the proper expertise is the collective moral judgment of the people rather than the moral judgment of agency experts; (2) such deference

---

[35] 356 F. Supp. 3d 109 (D.D.C. 2019).

[36] 920 F.3d 1 (D.C. Cir. 2019).

[37] ___ U.S. ___, 140 S. Ct. 789 (2020).

[38] ___ Fed. Supp. 3d ___, No. 18-CV-2988, 2021 U.S. Dist. LEXIS 30926 (D.D.C. Feb. 19, 2021).

[39] 363 F. Supp. 3d 823 (W.D. Mich. 2019).

[40] 992 F.3d 466 (6th Cir. 2021).

in the criminal context violates the separation of powers because it allows the Executive to functionally change the criminal laws without congressional input; and (3) this deference runs afoul of the rule of lenity and does not provide fair notice. The majority also held that "by single function of the trigger" referred to the mechanical process of the trigger and not the shooter's pulling of the trigger.

The dissent pointed out that there are cases where the Supreme Court has allowed *Chevron* deference to be applied in criminal matters; that such deference is not waivable, and that because the statutory wording is ambiguous—and the agency's interpretation is reasonable—that *Chevron* deference was appropriate.

However, about a month before oral argument in the case before this Court, the en banc Sixth Circuit vacated the panel decision and agreed to hear the case in front of the entire court.[41]

## II. DISCUSSION

### A. *Chevron* Deference in Criminal Cases and Waiver of *Chevron*

As a preliminary matter, we address whether *Chevron* deference applies to criminal cases, and whether the Government can waive a court's reliance on it. This is no small matter, because when courts apply *Chevron* deference, the agency interpretation carries the day almost 80 percent of the time.[42] Appellant argues *Chevron* deference does not apply in criminal cases and, naturally, agrees with the Government that it may waive reliance on the doctrine. This waiver means the Government would not prevail with merely a "reasonable" or "permissible" reading of the statute, but would only prevail if it had the "best" reading of the statute.[43] All that being said, evidenced by the many differing opinions of circuit court judges, the Supreme Court has not provided a crystal clear answer as to whether *Chevron* deference applies in criminal cases. As for waiver, the Supreme Court—just a few weeks prior to

---

[41] *Gun Owners of Am., Inc. v. Garland*, ___ F.3d ___, No. 19-1298, 2021 U.S. App. LEXIS 19006 (6th Cir. June 25, 2021).

[42] William N. Eskridge, Jr. & Lauren E. Baer, *The Continuum of Deference: Supreme Court Treatment of Agency Statutory Interpretations from* Chevron *to* Hamdan, 96 Geo. L.J. 1083, 1099 (2008). The authors also contend that agencies only prevail a combined 36.2% of the time in criminal cases or when an agency interpretation raises serious constitutional questions. *Id.*

[43] *Chevron*, 467 U.S. at 843.

oral argument in this case—accepted the Government's offer in *HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Association*,[44] an environmental case, to waive reliance on *Chevron* deference. So, we first address a major background issue, even if the Supreme Court's recent decision in *HollyFrontier*—and the parties' agreement—that the Government may waive reliance on *Chevron* is dispositive to that issue.

In 1984, a Supreme Court of only six justices issued an opinion in an environmental regulation case that was little noted at the time. At issue was whether the Reagan Administration's interpretation of an Environmental Protection Agency rule, which differed from the Carter Administration, was valid under the governing statute. The Court, in an opinion by Justice Stevens, departed from the traditional case-by-case analysis of interpretation of executive agency rules, and held that when courts are interpreting an ambiguous statute, they must defer to the agency's interpretation so long as its interpretation is "permissible." Since then, *Chevron* has been cited in various federal court opinions almost 18,000 times. *Chevron* worked a revolution in administrative law and increased executive agency power, but it was, and is, not without its critics,[45] who argue that it violates separation of powers because it confers too much legislative authority on the executive and strips the judiciary of its "province and duty . . . to say what the law is."[46]

Part of the controversy over *Chevron* is whether courts must defer to an agency's interpretation of an ambiguous statute in a criminal matter. *Chevron* itself was not a criminal case, though it did, like many, many federal statutes incur the possibility of civil *and* criminal penalties. Eight years after *Chevron*, in *United States v. Thompson / Center Arms Co.*,[47] it appeared the Court would apply the rule of lenity rather than defer to an agency where a statute that called for criminal penalties was ambiguous. In the judgment of the Court—there was only a plurality—Justice Souter doubted whether the government was entitled to deference; in a concurrence, Justices Scalia and Thomas believed the rule of lenity would apply in an ambiguous statute with criminal penalties. Justice Stevens dissented and remarked that this was a "tax case"—which it was—that only happened to have criminal penalties along with the civil penalties in the statute. But just three years later, in

---

[44] ___ U.S. ___, 141 S. Ct. 2172 (2021).

[45] *See*, *e.g.*, Philip Hamburger, *Chevron Bias*, 84 Geo. Wash. L. Rev. 1187 (2016).

[46] *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

[47] 504 U.S. 505 (1992).

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*,[48] a case involving a facial challenge to an environmental regulation, Justice Stevens, writing for the Court, affirmed the agency's interpretation of the statute. In a footnote, he commented, "We have never suggested that the rule of lenity should provide the standard for reviewing facial challenges to administrative regulations whenever the governing statute authorizes criminal enforcement."[49]

*Babbitt*, *Thompson / Center*, and *Chevron* itself, were all civil cases. But *United States v. O'Hagan*[50] was not just a challenge to, or a violation of, a statute with potential criminal penalties, it was a criminal case. O'Hagan, an attorney, was prosecuted for insider trading, specifically for violating various Securities and Exchange Commission [SEC] rules under the Securities and Exchange Act of 1934. He was sentenced to 41 months in prison.[51] The Court affirmed O'Hagan's conviction, holding that the SEC's judgment on its rules determining what constituted insider trading were entitled to "more than mere deference."[52] The Court cited a pre-*Chevron* case[53] for the proposition that when Congress has expressly delegated to an agency the direct legislative authority to prescribe rules pertaining to a statute, then that agency's assessment of those rules are given "controlling weight unless it is arbitrary, capricious, or manifestly contrary to the statute."[54] Justice Scalia, in one of the dissents, challenged the Court's reading of the rule, but he also made clear the Court was not relying on *Chevron* deference. He remarked— uncorrected or challenged by the majority—that the Court was issuing an opinion "where (as here) no *Chevron* deference is being given to the agency's interpretation."[55] *O'Hagan* may have been a criminal case involving an agency's opinion of its rules, but it was not one where *Chevron* deference was applied.

---

[48] 515 U.S. 687 (1995).

[49] *Id.* at 704, n.18.

[50] 521 U.S. 642 (1997).

[51] *United States v. O'Hagan*, 92 F.3d 612, 614 (8th Cir. 1996).

[52] *O'Hagan*, 521 U.S. at 673 (internal citation omitted).

[53] *Batterton v. Francis*, 432 U.S. 416, 424–426 (1977).

[54] *O'Hagan*, 521 U.S. at 673 (citing and quoting *Chevron*, 467 U.S. at 844).

[55] *Id.* at 679 (Scalia, J., dissenting).

In 2014, the Supreme Court made brief statements pertaining to *Chevron* in two more criminal cases, *United States v. Apel*[56] and *United States v. Abramski*.[57] In *Apel*, the Court affirmed a conviction for trespassing by a protestor onto a military installation. Apel cited to a Department of Justice manual for United States Attorneys and an Instruction issued by the Judge Advocate General of the Air Force that appeared to support his argument concerning whether the United States had exclusive jurisdiction to enforce the area where he trespassed. The Court disagreed that those "Executive Branch documents" were "intended to be binding" and added, "[e]ither way, we have never held that the Government's reading of a criminal statute is entitled to any deference."[58] While this would seem unequivocal, some have argued that this dicta does not speak to the ultimate question of *Chevron* deference in criminal cases because these "Executive Branch documents" have much less authority than an agency rule.

Similarly, in *Abramski* the issue was whether the ATF's relatively new policy of interpreting what constituted a material term on forms used for purchasing firearms. Abramski entered a conditional plea to making a false material statement when he was making a "straw purchase" of a firearm for his uncle. His uncle *was* legally eligible to purchase and possess a firearm. When Abramski made the purchase, he wrote on the form that he, and not his uncle, was the buyer. This was not true. Until 1995, the ATF would not have considered this "material" because Abramski's uncle was still lawfully allowed to possess a firearm, but since then, the agency has interpreted such an omission or false statement as material. Abramski argued that the Court should consider the "old" ATF interpretation. Justice Kagan, writing for the Court, emphatically disagreed with the premise:

> We may put aside that ATF has for almost two decades now taken the opposite position . . . . The critical point is that criminal laws are for courts, not the Government, to construe. We think ATF's old position no more relevant than its current one—which is to say, not relevant at all.[59]

But again, like in *Apel*, the ATF position on a straw purchaser's misrepresentation, at issue in *Abramski*, was not subject to the notice and comment

---

[56] 571 U.S. 359 (2014).

[57] 573 U.S. 169 (2014).

[58] *Apel*, 571 U.S. at 368–69.

[59] *Abramski*, 573 U.S. at 191 (citing *id*, 571 U.S. at 369).

rulemaking process that was employed by the ATF for its Final Rule regarding bump stocks.

Though one can easily surmise that Justice Gorsuch believes *Chevron* "has nothing to say about [a criminal] law,"[60] the Supreme Court as a whole has not conclusively provided an answer to whether *Chevron* deference applies in criminal cases where an ambiguous statute is defined by an agency rule subject to notice and comment rulemaking procedures. There is no case directly on point from the Court, or for that matter, any persuasive authority from the various Circuit Courts of Appeal, as those cases were all civil actions seeking preliminary injunctions. The Court of Appeals for the Armed Forces [CAAF] has cited *Chevron* only twice and never applied *Chevron* deference. The first was to note that although the lower court and the parties relied on *Chevron,* it did not apply to selection of courts-martial members under Article 25, UCMJ.[61] The second was just to quote *Chevron*'s language that when Congress has "spoken to the precise question at issue" a court must "give effect to the unambiguously expressed intent of Congress."[62] This Court has also only cited *Chevron* twice. The most recent citation was in a dissent that merely noted that a Defense Finance and Accounting Service regulation of pay, though it might not be entitled to *Chevron* deference, might well be worthy of other modes of judicial deference (i.e., *Skidmore*[63] deference).[64]

However, this Court's first citation to *Chevron* was in *United States v. Baldwin,*[65] an unpublished decision, which briefly addressed the issue. The appellant argued that when he ordered controlled substances through the mail while he was stationed in Iraq, he did not violate a federal statute prohibiting mailing of "all kinds of poison." The Government then argued that according to some United States Postal Service regulations, controlled

---

[60] *Guedes,* 140 S. Ct. at 789.

[61] *United States v. Bartlett*, 66 M.J. 426, 427 (C.A.A.F. 2008).

[62] *United States v. Kearns*, 73 M.J. 177, 181 (C.A.A.F. 2014).

[63] *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) (less deference given to an agency's informal documents such as internal opinion letters and bulletins).

[64] *United States v. Jones*, No. 201200264, 2015 CCA LEXIS 573 at *34–35 (N-M. Ct. Crim. App. Dec. 29, 2015) (Brubaker, S.J., concurring in part and dissenting in part) (unpublished), *rev'd sub nom. United States v. Howell*, 75 M.J. 386 (C.A.A.F. 2016).

[65] No. 200800882, 2009 CCA LEXIS 375 (N-M. Ct. Crim. App. Oct. 29, 2009) (unpublished).

substances could qualify as "poison" under the statute. This Court acknowledged that *Chevron* "deference is ordinarily owed the interpretation of the administrative agency charged with overseeing a particular statute."[66] But, along with other problems with the Government's arguments, this Court stated we would not apply *Chevron* deference because, "The rule of lenity militates against such deference in the context of a criminal statute lacking clear and definite terms, particularly when the statute at issue fails to make the violation of the respective agency's rules and regulations an offense."[67] We cited to a concurrence in a 1990 Supreme Court case, *Crandon v. United States*,[68] which was also cited later by the Supreme Court in *Apel* for the same proposition.

On balance, we are skeptical that when the judiciary interprets an ambiguous criminal statute it must defer to the judgment of the same executive who is prosecuting the defendant. This appears to undercut the bedrock concept of separation of powers embedded in our Constitution. The Framers were well-versed in the political philosophy behind separation of powers as expressed by Montesquieu, Blackstone, Locke, and even Aristotle.[69] Historically, concentration of power is the death knell for self-government and liberty. We also doubt whether the Supreme Court has clearly told us we must defer to the Government's view that Appellant has violated an ambiguous criminal statute just because it is the Government's current "permissible" view. But it is something we need not decide to resolve this issue.

Just a few weeks before oral argument in this case, the Supreme Court issued its opinion in *HollyFrontier*. During the previous administration, the government argued the case at the lower court and asked for and received *Chevron* deference. However, *HollyFrontier* plainly describes the government's about-face: "With the recent change in administrations, 'the government is not invoking *Chevron*.' Brief for Federal Respondent 46–47. We therefore decline to consider whether any deference might be due its regula-

---

[66] *Id*. at *12.

[67] *Id*. at *13.

[68] 494 U.S 152, 177–78 (1990) (Scalia, J., concurring).

[69] *See* generally, *The Federalist* Nos. 47–51 (James Madison). In *Federalist* 47, Madison calls the "accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . the very definition of tyranny." *See also* Steven G. Calabresi, Mark E. Berghausen, & Skylar Albertson, *The Rise and Fall of the Separation of Powers*, 106 N.W. L. Rev., 527, 529–36 (2012).

tion."[70] At the lower court the government won with *Chevron*, but lost at the Supreme Court without it. Following the *HollyFrontier* Court, and the Government's disclaimer of *Chevron* deference in this case, in both its written pleading and at oral argument before us, we hold that the Government may waive reliance on *Chevron*. And despite *HollyFrontier* not being a criminal case, we further find that the Government's waiver of *Chevron* is not affected by whether the waiver comes in a criminal or civil case.

## B. Though the Statute is Ambiguous, Appellant's Bump Stock is Not a Machine Gun Under the Statute

### 1. Standard of review and the law

This Court reviews de novo questions of statutory interpretation and whether a specification states an offense."[71]

In statutory construction, we must first look to the statute and "give effect to the clear meaning of statutes as written."[72] Each word of a statute should be given its "ordinary, contemporary, and common meaning"[73] at the time the statute was enacted. When a statute's language "is unambiguous, the statute's plain language will control."[74] Whether a statute is ambiguous or not is determined, not by mere disagreement by the parties, but "by reference to the language itself, the specific context in which the language is used, and the broader context of the statute as a whole."[75] The separation of powers doctrine prevents courts from interpreting statutes to "accommodate [a] policy concern."[76]

---

[70] *HollyFrontier*, ___ U.S. ___, 141 S. Ct. at 2180. Justice Gorsuch, one of the more vocal critics of *Chevron*, was writing for the Court.

[71] *United States v. Schloff*, 74 M.J. 312, 313 (C.A.A.F. 2015) (citing *United States v. Vargas*, 74 M.J. 1, 5 (C.A.A.F. 2014) (statutory interpretation); *United States v. Rauscher*, 71 M.J. 225, 226 (C.A.A.F. 2012) (state an offense).

[72] *United States v. Andrews*, 77 M.J. 393, 400 (C.A.A.F. 2018) (internal citation and quotation omitted).

[73] *Id.* (internal citation and quotation omitted).

[74] *United States v. Jacobsen*, 77 M.J. 81, 84 (C.A.A.F. 2017) (citing *United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 20130).

[75] *United States v. McPherson*, 73 M.J. 393, 395 (C.A.A.F. 2014) (citing *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)).

[76] *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 531 (2019).

In interpreting statutes, courts have a host of tools available. We consider the overall structure and text of a statute and use various applicable canons of statutory construction. Canons such as the whole-text, consistent usage, and the associated words canon (*noscitur a sociis* or "it is known by its associates") apply here. One additional canon, should all else fail, is the rule of lenity, which, as articulated by Chief Justice Marshall in 1820, is the "well known rule that . . . a penal statute . . . is to be construed strictly" and is "founded on the tenderness of the law for the rights of individuals."[77]

The statute, as discussed above, defines "machinegun." Under section (b) of the statute:

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically, more than one shot, without manual reloading, by a single function of the trigger.[78]

But the statute also covers other types of firearms, such as rifles and shotguns. In section (c):

> The term "rifle" means any weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each *single pull* of the trigger, and shall include any such weapon which may be readily restored to fire a fixed cartridge.[79]

And in section (d):

> The term "shotgun" means any weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile *for each pull* of the trigger, and shall include any such weapon which may be readily restored to fire a fixed shotgun shell.[80]

---

[77] *United States v. Witlberger*, 18 U.S. 76, 94–95 (1820).

[78] 26 U.S.C. § 5845(b).

[79] 26 U.S.C. § 5845(c) (emphasis added).

[80] 26 U.S.C. § 5845(d) (emphasis added).

### 2. *The statute is ambiguous*

At its heart, the disagreement is whether the bump stock's significant in-crease in a semi-automatic rifle's firing rate—despite it still technically only firing a single round per single pull of the trigger—and whether the shooter's non-firing hand action is part of the "automatic" firing sequence makes a semi-automatic rifle a machine gun. The Government favors a reading of the term "single function of the trigger" to mean that the bump stock's recoil capture, the action of the shooter's non-firing hand applying forward pressure on the barrel or upper receiver of the rifle, and the apparent single pull of the trigger means that the rifle is "automatically" firing multiple shots. This is a "shooter-focused" approach to the statute. But Appellant argues that contrary to the shooter-focused approach, the statute speaks only to the internal mechanical workings of the rifle. Under this view of the statute's meaning, a machine gun is a weapon, which if one pulls the trigger, and nothing else, the "function" of the trigger automatically continues to feed, chamber, lock, fire, unlock, extract, eject, cock—and repeat—until the shooter stops or until the ammunition is depleted. Appellant's argument has been characterized as a "mechanical reading."

Bump stocks have been around for almost twenty years. During that peri-od, the ATF has issued multiple opinions on whether the devices constitute machine guns under the statute. First, in considering the Akins Accelerator—the bump stock with the internal spring—the ATF considered it not to be a machine gun. Then it changed its mind, deciding that it was. For over a decade, the ATF consistently interpreted the statute to mean that bump stocks like the one Appellant possessed were not machine guns. Then it changed its mind after the Las Vegas shooting and the President's direction to do so. While the ATF, like other executive agencies, is allowed to change its mind about how it interprets its governing statutes and agency rules, its dramatic about-face indicates the statute is less than crystal clear about what exactly is a machine gun. Historically, the practice of firearms manu-facturers approaching the ATF for advisory opinions before selling a firearm or firearm component, such as a bump stock, informs our view. Asking the government if your proposed behavior violates the law could just be prudence, but it is also a sign the law might be ambiguous. Because of the plausibility of either the shooter-focused or the mechanical reading, we find the statute with respect to the meaning of "by a single function of the trigger" and "automatically" is ambiguous.

### 3. *"By a single function of the trigger"*

We start with a dictionary. We look for what the most commonly under-stood meaning of the term was at the time of the enactment of the statute.

Though the NFA was passed in 1934, as the (since vacated) majority panel opinion from the Sixth Circuit in *Gun Owners of America* pointed out, in 1968, with the GCA, Congress chose to redraft the NFA, but left identical language for this section of the statute.[81] Thus, we rely on 1968-era dictionaries instead of ones from 1934, though there is no material change in the meaning of "function" (or "automatically") between the time periods.

In the relevant context, the term "function" means "the acts or operations expected of a . . . thing" or the "characteristic action of a . . . manufactured or created thing."[82] It is also defined as "the action for which a . . . thing is specially fitted, [or] used" or "the activity appropriate to the nature . . . of a . . . thing."[83] The question is whether it is an "action" of the shooter or an "action" of the trigger and all the associated mechanical parts of the firearm that are engaged as a result of pulling the trigger. The best read implies that the shooter initiates the trigger function by some action, such as pulling the trigger—or it could be by just pushing a button—and it is the follow-on action where the trigger acts out its mechanical design or purpose that speaks to the "function of the trigger." The statute does not say "by a single function of the trigger finger" nor does it say "by a single pull of the trigger in addition to external pressure from the shooter's non-firing hand."

The Government asks this Court to rely on a footnote in the Supreme Court's opinion in *Staples v. United States*[84] in interpreting what a machine gun is. The Court's footnote stated:

> As used here, the terms "automatic" and "fully automatic" refer to a weapon that fires repeatedly with a single pull of the trigger. That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted. Such weapons are "machineguns" within the meaning of the Act. We use the term "semiautomatic" to designate a weapon that fires only one shot with each pull of the trigger, and which requires no manual manipulation by

---

[81] *Gun Owners of America, Inc.*, 2021 U.S. App. LEXIS at *53, n.8 (citing *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 226–28 (2014)).

[82] *Webster's Seventh New Collegiate Dictionary* 338 (1967).

[83] *Webster's Third New International Dictionary* 920–21 (1967).

[84] 511 U.S. 600 (1994).

the operator to place another round in the chamber after each
round is fired.[85]

This footnote appears in the introductory paragraph of the first section of
the opinion as the Court lays out the NFA's general background. The footnote
pertains to the sentence, "Thus, any fully automatic weapon is a 'firearm'
within the meaning of the Act."[86]

This footnote is not the interpretation of a statute. The issue in *Staples*
was whether or not the statute in question contained a mens rea element for
firearms purchasers and whether certain firearms fell within the statute's
definition of a machine gun. This footnote is merely a general and basic
explanation for a reader who may be unfamiliar with firearms. We are not
the only court to make this observation. In *United States v. Olofson*,[87] the
Seventh Circuit held that a firearm was a machine gun when it fired military
grade ammunition automatically despite it jamming after only a three or four
round burst when using civilian grade ammunition. The court "described the
*Staples* footnote as merely 'offering commonsense explanations' of the words
*automatic* and *semiautomatic*, which confirms that we did not consider that
passage to be precedentially binding."[88]

Another consideration that goes squarely against the Government's read-
ing is that it urges us to judicially transform the phrase "by a single *function*
of the trigger" into "by a single *pull* of the trigger." The overall structure and
text of the statute will not allow this. In defining *rifles* and *shotguns*, Con-
gress chose to use the phrases "single pull of the trigger" and "each pull of the
trigger" respectively. "We do not, however, construe statutory phrases in
isolation; we read statutes as a whole."[89] Had Congress wanted to use the
phrase "by a single pull of the trigger" for *machine guns*, it could have. But it
did not. Congress could have suggested that a shooter-focused approach or
even a rate-of-fire approach was the way to read the statute by enacting
those words. Even the term "machine gun" suggests a mechanical approach
where the shooter interaction is extremely limited. Applying the whole-text
canon, we find that a machine gun shoots "by a single function of the trigger,"

---

[85] *Id*. at 602, n.1.

[86] *Id*. at 602.

[87] 563 F.3d 652 (7th Cir. 2009).

[88] *Id*. at 658 (quoting *United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002))
(cleaned up).

[89] *United States v. Morton*, 467 U.S. 822, 828 (1984).

whereas firearms that are not machine guns, such as rifles and shotguns, shoot with a "single pull of the trigger." Thus, "by a single function" cannot be read to mean "by a single pull."

Along with the whole-text canon, we also consider the canon of consistent usage. As noted above, the statute uses the term "single function of the trigger" for machine guns, but "single pull" or "each pull" of the trigger for rifles and shotguns. A term that is used in a statute should be interpreted to mean the same thing when that term is repeated in the same statute, just as different terms should not be interpreted to mean the same thing unless the statute clearly indicates otherwise. For example, if a statute "says *land* in one place and *real estate* later, the second provision presumably includes improvements as well as raw land."[90] The take-away is that *land* and *real-estate* mean something different, just as *function* and *pull* do. The Government's interpretation would require the statute to have identical meanings for different terms. The more logical read is that when the statute uses different terms, the different terms have different meanings. That is another reason that "by a single function" cannot be read to mean "by a single pull."

Somewhat, though not perfectly, adjacent to the whole-text and consistent-usage canons is the canon of associated words, or *noscitur a sociis*. This canon is usually employed concerning lists of similar things. Should there be confusion over what one of the terms means, it is resolved in a way that defines the term to be included among the other terms in the most natural and common way. In short, "a word is known by the company it keeps."[91] The statute describes three very different types of firearms: machine guns, rifles, and shotguns. It also treats them very differently based on how they are operated and even manufactured. They are listed in separate definitional sub-sections. They should not be merged together as all having identical definitions describing their singularly relevant method of operation, i.e., by a "single pull of the trigger." They are not associated in the statute in a way that the common reader would understand them to be like one another in the overall context. In the text, machine guns, rifles, and shotguns do not keep one another's company. Similarly, "function" does not keep the company of "pull," and the former should not be replaced by the latter using a judicial shoehorn.

---

[90] Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 170 (2012).

[91] *United States v. Martinelli*, 62 M.J. 52, 61 (C.A.A.F. 2005).

We conclude that when the statute uses the phrase "by a single function of the trigger," it speaks to the mechanical actions, makeup, design, and attributes of the firearm itself, and includes modifications making the firearm operate precisely as a machine gun would under the statute. Here, the "function" of the trigger in a semi-automatic rifle, even with a bump stock attached, is to fire only a single round with each single pull of the trigger. But the "function" of the trigger in a machine gun is the mechanical process of firing multiple rounds with only a single pull of the trigger by the shooter.

*4. "Automatically"*

Holding that bump stocks do not come within the statutory definition of a machine gun because they do not allow firearms to fire multiple rounds "by a single function of the trigger," it is unnecessary to address the meaning of "automatically." However, assuming arguendo we have erred in our analysis of the meaning of "by a single function of the trigger," we hold that a bump stock also does not make a weapon fire "automatically" under the statute.

Again, we start with a dictionary from near 1968. "Automatically" is defined as the adverbial form of automatic. "Automatic" means "[h]aving a self-acting or self-regulating mechanism that performs a required act at a predetermined point in an operation"[92] or "self-acting under conditions fixed for it, going of itself."[93] One of the definitions from an unabridged 1967 dictionary is on point in defining "automatic" for "of a firearm." The definition:

> Marked by the use of either gas pressure or force of recoil and mechanical spring action for ejecting the empty cartridge case after the first shot, loading the next cartridge from the magazine, firing, ejecting the spent case, and repeating the above cycle as long as the pressure on the trigger is maintained and there is ammunition in the magazine or other loading device.[94]

The crux of the disagreement here is whether a machine gun will fire automatically without any human, non-mechanical action beyond just pulling the trigger. The Government argues that the pressure a shooter would normally use to keep his finger on the trigger finger is merely continued, but enhanced by forward pressure on the barrel or upper receiver of the firearm.

---

[92] *Webster's Third New International Dictionary* 148 (1967).

[93] *Webster's Seventh New Collegiate Dictionary* 338 (1967).

[94] *Webster's Third New International Dictionary* 148 (1967).

"A bump stock simply relocates the focus of that pressure."[95] But Appellant argues this human interaction causing the forward pressure "takes it out of the realm of 'automatic.'"[96]

The statute states, in part, that a machine gun is a firearm that will "shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."[97] So, this necessarily means that the shooting is only automatically done by a single function of the trigger, and *only* a single function of the trigger. The syntax indicates that anything that makes the firearm shoot "automatically" beyond a single function of the trigger is not a machine gun within the meaning of the statute. The Government's reading of the statute means that a firearm that shoots more than one shot by a single *pull* of the trigger—from the shooter's perspective—*and also* forward pressure on the weapon with the non-shooting hand is a machine gun.

The word "automatically" conjures up images of machines, or robots, or automatons. All things that are separate and distinct from a person. Even the word "auto," from the Greek *autós*, means "self" or "of or by oneself, independently."[98] An autobiography is a person's biography penned by the subject. An automobile is self-moving, a plane on auto-pilot is self-flying, an autograph is someone's own signature, and so forth. "Matic" is derived from the Latin *ment-* or *mens*, meaning mind.[99] In short, "automatic" suggests by its ordinary meaning *de minimus* human interaction and only just enough to merely initiate the "automatic" process.

With a machine gun, the automatic process that matters is the feeding, firing, and ejecting of ammunition. The single pull of the trigger is what initiates the process. Continuing to hold the trigger is an extended initiation sequence that continues until the weapon either malfunctions or exhausts its ammunition. And this makes all the difference. An extended initiation sequence where a shooter simply pulls and holds the trigger on a semi-automatic firearm, only fires a single round. This is still true when that same semi-automatic firearm has a bump stock attached to it. Any actions beyond

---

[95] Appellee's Answer at 32.

[96] Appellant's Br. at 44.

[97] 26 U.S.C. § 5845(b).

[98] *The Oxford Dictionary of English Etymology* (C.T. Onions ed. 1966).

[99] *Webster's Seventh New Collegiate Dictionary* 338 (1965). "*Ment-*" referring to the various cases of the word in Latin.

that of the initiation sequence—pulling the trigger—expand beyond the ambit of the common understanding of "automatically." It is incorrect to equate the holding of the trigger in an automatic weapon with the holding of the trigger and the forward motion in a semi-automatic weapon equipped with a bump stock. That is because the former is shooting automatically *by a single function of the trigger*, while the latter is relying on an additional human action beyond the mechanical self-acting and impersonal trigger function.

Many other firing mechanisms have been used to try to "get around" the statute, whether by inventions that fire not by using a "trigger" or by not shooting "automatically." Courts have rejected them and considered them to be machine guns. For example, in the aforementioned *Staples*, the Supreme Court easily held that when a metal stopper in a semi-automatic rifle had been filed away to allow placement of an automatic firing switch, the weapon was now able to fire automatically. This was an internal change to the weapon that transformed it from a semi-automatic rifle into a fully-automatic machine gun, thus requiring no additional human interaction other than initiating the trigger function. In *Bishop v. United States*,[100] a Tenth Circuit case cited by the Government, a semi-automatic rifle had been mechanically altered to allow for automatic firing by initiating the trigger function. In *United States v. Oakes*,[101] another Tenth Circuit case, a mechanism where a modified firearm had two "triggers"—where pulling the first trigger automatically pulled the second trigger—was held to be a machine gun because initiating the trigger function by pulling the first trigger led to automatic firing without any additional human input.[102] Even firearms without actual triggers can have a "trigger function" that initiates automatic firing. For example, a firearm with no actual trigger where the shooter pulls the bolt to the rear and releases it forward (letting the bolt "go home") was held by the Sixth Circuit[103] to be a machine gun. This was because it fired automatically when the shooter initiated the trigger function by letting the bolt go home. Initiating a firing sequence with a single human interaction that automatically leads to automatic fire is the hallmark of what makes a machine gun a machine gun. This is true whether the "trigger" is a spring used to strike a

---

[100] 926 F.3d 621 (10th Cir. 2019).

[101] 564 F.2d 384 (10th Cir. 1977).

[102] 564 F.2d at 388.

[103] *United States v. Carter*, 465 F.3d 658, 665 (6th Cir. 2006).

nail serving as the firing pin,[104] or when an aircraft mini-gun uses a button, rather than a trigger, to fire automatically.[105]

One final example that is instructive is from a Fifth Circuit case, *United States v. Camp*.[106] Camp had his indictment for possessing a machine gun dismissed by the district court judge. When the United States appealed, the Fifth Circuit reversed. Camp had a semi-automatic rifle that had an additional switch behind the trigger. When the trigger was pulled, the switch activated a small, electrically-powered fishing reel inside the trigger guard. This caused the weapon to fire in rapid succession, much like how a semi-automatic rifle fires when a shooter uses a bump stock. Camp argued this was a "merely a legal 'trigger activator.' "[107] An ATF agent testified that trigger activators were considered to be legal by the ATF and "involve using springs that 'force the trigger back to the forward position, *meaning that you have to separately pull the trigger each time you want to fire the gun*, but it gives the illusion of functioning as a machine gun.' "[108] The agent testified that the ATF considered trigger activators to be legal "insofar as they do not transform legal firearms into machine guns." But Camp's device was not a trigger activator, it was an alteration to the weapon that caused it to fire automatically with a single function of the trigger.

To us, the bump stock possessed by Appellant appears to be a "trigger activator," albeit without the internal spring like the Akins Accelerator. Rather than an internal spring automatically assisting with firing after the shooter initiates the trigger function, this requires the shooter to have additional non-mechanical interaction with the weapon, which is still firing only a single round per function of the trigger, despite the "illusion of functioning as a machine gun."[109]

During his testimony on the Defense motion to dismiss for failure to state an offense, Gunner Whiskey commented that a bump stock is, "in an engineering physical way" a "very clever way to get a semi-automatic weapon . . .

---

[104] *United States v. Jokel*, 969 F.2d 132, 134-35 (5th Cir. 1992).

[105] *Fleischli*, 305 F.3d at 655.

[106] 343 F.3d 743 (5th Cir. 2003).

[107] *Id*. at 745.

[108] *Id*. (emphasis in original).

[109] *Id*.

to fire as a machine gun."[110] Perhaps he is right. But until Congress changes the law, a bump stock like the one possessed by Appellant on a semi-automatic rifle is not a machine gun under the statutory definition.

### 5. *The rule of lenity*

Finally, because we find the statute to be ambiguous, assuming arguendo our statutory analysis was incorrect and the ambiguity could not be resolved, we would apply the rule of lenity. We would do so at the "end of the process" of statutory interpretation,[111] owing to genuine confusion as to what the statute means, rather than from any "overriding consideration of being lenient to" Appellant.[112] Appellant had "notice" of the law. We know this because when Appellant was home on leave, he falsely told a gun store owner his bump stock had been confiscated.[113] But it is clarity rather than notice that is the focus of the rule of lenity. Appellant had notice, not that the statute had changed, but that the ATF's interpretation of the statute had changed. Appellant may have even had "notice" that litigation concerning the meaning of the statute was pending or ongoing on the day he was apprehended. Notice is irrelevant if the statute that expresses the "moral condemnation"[114] of society is itself unclear. We decline to step into the role of the legislature when the legislature has not been clear about whether Appellant's conduct was criminal. Judge Henry Friendly described the rule of lenity as "the instinctive distaste against men languishing in prison unless the lawmaker has clearly said they should."[115] Here, we express that distaste.

---

[110] R. at 62.

[111] We discern nothing helpful or noteworthy in reviewing the statute's "history and purpose." *See Maracich v. Spears*, 570 U.S. 48, 76 (2013). As this Court has stated before, we are reluctant to consider "legislative history" in statutory interpretation. *See*, e.g., *United States v. Begani*, 79 M.J. 767, 781 n.85 (N-M. Ct. Crim. App. 2020), *aff'd*, ___ M.J. ___, No. 20-0217, 2021 CAAF LEXIS 608 (C.A.A.F., June 24, 2021); *In re Gilpin*, ___ M.J. ___, No. 201900033, 2021 CCA LEXIS 287, at *12, n.31 (N-M. Ct. Crim. App. June 22, 2021). Even so, we find nothing in the available legislative history that affects our analysis.

[112] *Callanan v. United States*, 364 U.S. 587, 596 (1961).

[113] R. at 214.

[114] *United States v. Bass*, 404 U.S. 336, 348 (1971) ("[B]ecause criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity.").

[115] *Id.* (citing "H. Friendly, *Mr. Justice Frankfurter and the Reading of Statutes, in Benchmarks* 196, 209 (1967).")

*6. Conclusion*

We conclude that Charge VII, Specification 1, by alleging Appellant's possession of a bump stock violated the prohibition against possessing a "machinegun" as defined under 26 U.S.C. § 5845(b), fails to state an offense punishable under the UCMJ. Accordingly, we determine the finding of guilty for this offense is not correct in law and fact and must be set aside and the specification dismissed. We take such action in our decretal paragraph.

## C. Portions of the Remaining Sentence are Inappropriate

*1. Standard of review and the law*

This Court "may affirm only such findings of guilty and the sentence or such part or amount of the sentence, as it finds correct in law and fact and determines, on the basis of the entire record, should be approved."[116] "Sentence appropriateness involves the judicial function of assuring that justice is done and that the accused gets the punishment he deserves."[117] This analysis requires " 'individualized consideration' of the particular accused 'on the basis of the nature and seriousness of the offense and the character of the offender.' "[118] Article 66(d)'s "sentence appropriateness provision is a sweeping [c]ongressional mandate to ensure a fair and just punishment for every accused."[119] This Court is required to "independently determine . . . the sentence appropriateness of each case . . . ."[120] While we "review sentence appropriateness de novo,"[121] we do not have "the ability to grant mercy."[122]

*2. Unitary and segmented sentencing*

The Military Justice Act of 2016 created many significant changes within military justice. One of them was to implement the practice of "segmented"

---

[116] Article 66(d), UCMJ.

[117] *United States v. Healy*, 26 M.J. 394, 395 (C.M.A. 1988).

[118] *United States v. Snelling*, 14 M.J. 267, 268 (C.M.A. 1982) (quoting *United States v. Mamaluy*, 27 C.M.R. 176, 180–81 (C.M.A. 1959)).

[119] *United States v. Baier*, 60 M.J. 382, 384 (C.A.A.F. 2005) (internal quotations omitted).

[120] *Id.* at 384–85 (internal quotations omitted).

[121] *United States v. Lane*, 64 M.J. 1, 2 (C.A.A.F. 2006).

[122] *United States v. Nerad*, 69 M.J. 138, 146 (C.A.A.F. 2010) (citing *United States v. Boone*, 49 M.J. 187, 192 (C.A.A.F. 1998)) (internal quotations omitted).

sentencing. Prior to MJA 16, court members, or a military judge, would adjudge a "unitary" sentence—a single sentence that expressed the entire punishment for all findings of guilt. For example, court members or the military judge could sentence a Marine to confinement for 25 years, forfeiture of all pay and allowances, reduction to E-1, and a dishonorable discharge for the crimes of murder *and* making a false official statement.[123] One would not know with any real precision how much the false official statement, or for that matter, the murder, contributed to the sentence. Under MJA 16 procedures involving convictions for multiple offenses, a military judge (but not court members) adjudges segmented sentences for confinement and fines. That is, the military judge adjudges confinement and / or a fine for each separate offense and, in the case of confinement for more than one offense, determines whether the confinement periods will run concurrently or consecutively.[124]

Prior to MJA 16, in the instance where one of the findings, but not all, were set aside, a service court of criminal appeals would sometimes determine for itself what the appropriate sentence should be. For example, in *Jackson v. Taylor*,[125] the Board of Review (as it was called then) set aside Jackson's premeditated murder conviction, but affirmed his attempted rape conviction. Jackson's life sentence was set aside. His reassessed sentence included only 20 years of the confinement portion of his sentence.

The guidance from CAAF on whether a service court of criminal appeals should reassess a sentence or order a rehearing for sentencing is well-familiar. Under *United States v. Winkelmann*,[126] CAAF provided "illustrative, but not dispositive" factors for us to consider: (1) whether there are "dramatic changes in the penalty landscape and exposure"; (2) whether an appellant "chose sentencing by members or a military judge alone"; (3) whether the "nature of the remaining offenses capture the gravamen of criminal misconduct included within the original offenses and, in related manner, whether significant or aggravating circumstances addressed at the court-martial remain admissible and relevant to the remaining offenses"; and (4) whether the "remaining offenses are of the type that judges of the courts of criminal

---

[123] *United States v. Walker*, No. 201100463, 2012 CCA LEXIS 396 at *2 (N-M. Ct. Crim. App. Sept. 26, 2012) (unpublished).

[124] *See* R.C.M. 1002(d)(2).

[125] 353 U.S. 569 (1957).

[126] 73 M.J. 11 (C.A.A.F. 2013).

appeals have the experience and familiarity with to reliably determine what sentence would have been imposed at trial."[127]

In reassessing a sentence in a case involving segmented sentencing, we first set aside the segmented confinement and / or fines adjudged for any findings we have set aside. Next, we apply the *Winckelmann* analysis to reassess the sentence for the remaining offenses we have affirmed. We do this by considering not only the unitary components of the sentence, such as an adjudged punitive discharge, *but also* the segmented sentence components adjudged for the offenses we have affirmed. MJA 16 did not alter our duty under Article 66(d), UCMJ, to ensure we affirm only an appropriate sentence, even if we can readily determine what the trial court intended to adjudge in a segmented sentence. Having done so in this case, we find the confinement adjudged for the remaining offenses is inappropriate and take action in our decretal paragraph.

*3. Sentence reassessment of the unitary and segmented sentence*

Appellant remains convicted of making false official statements to his gunnery sergeant and to an Offutt AFB security officer; fraudulently enlisting in the Marine Corps; and possessing machine guns by virtue of possessing the two switches. The unitary portion of his sentence was total forfeitures, reduction to E-1, and a bad-conduct discharge. In setting aside and dismissing the single specification for possessing the bump stock, we do not find "dramatic changes in the penalty landscape or exposure."[128] In fact, given that the only change to the penalty exposure was in the maximum total confinement for the segmented portion of the sentence, there is no change in the sentencing landscape or exposure for the unitary sentence. Appellant was sentenced by a military judge, and the unitary portion of the sentence was dictated by the terms of the plea agreement. The military judge was required to adjudge a bad-conduct discharge, total forfeitures, and reduction to E-1. We also find the gravamen of criminal misconduct is unchanged and the remaining offenses are generally of the type well-known to the judges of this Court. Ultimately, with MJA 16 sentence limitations in this particular plea agreement, we have strong indications of what the unitary portion of the sentence would have been without the conviction for possessing a bump stock. We conclude that it would have been unchanged.

---

[127] *Id*. at 15–16.

[128] *Wincklemann*, 73 M.J. at 15.

The same holds true for the segmented portion of the sentence. The confinement ranges were listed in the plea agreement for each specification. Because of MJA 16, the unitary and the segmented sentence reassessment for this case resembles a tower of blocks that remains standing when one block is removed. We hold that MJA 16's segmented sentencing obviates the need for sentence *reassessment* of confinement or fines imposed by a military judge for specifications that were not set aside. But there is still the matter of whether the remaining segmented and unitary sentences are *appropriate*.

*4. Sentence appropriateness analysis for segmented sentences*

a. The false official statements and the fraudulent enlistment

We initially address Appellant's false official statement to his gunnery sergeant [24 months]; his false official statement to the Offutt AFB security officer [24 months]; and his fraudulent enlistment [24 months]. We find each of these segmented sentences to be inappropriate.

Appellant was on his way to the airport in Hawaii to catch a flight to return home to Nebraska. Appellant's false official statement to his gunnery sergeant was predicated on his fear of ultimately missing his flight if he were forced to return to base and check-out properly. Obviously, Appellant should not have lied to his gunnery sergeant. But that is not what is at issue here. It strikes us as self-evident that this scenario does not call for 24 months' confinement, or anything remotely close to that.[129] We find under these facts that an appropriate segmented sentence is no more than 30 days' confinement, consistent with the maximum confinement available to someone of Appellant's rank at a summary court-martial.[130]

Prior to the search of his vehicle, Appellant lied to the Offutt AFB security officer when he told him his truck did not contain any firearms. This is also obviously behavior meriting punishment. We recognize that lying to law enforcement about the possibility of encountering weapons or ammunition during a search enters the realm of officer safety and is not a matter to be

---

[129] We remind military judges, counsel, staff judge advocates, and convening authorities, that despite the changes from MJA 16, military judges are still empowered to decline to accept terms contained in plea agreements that violate public policy, appellate case law, or fail to adhere to basic notions of fundamental fairness. *See United States v. Soto*, 69 M.J. 304, 307 (C.A.A.F. 2011); *United States v. Hall*, 26 M.J. 739, 743 (N-M. Ct. Mil. Rev. 1988).

[130] R.C.M. 1301(d)(1) (2019).

taken lightly. Again, that is not what is at issue here. When Appellant was flagged at the gate by DBIS, he was told to exit his vehicle. He was detained and then handcuffed. When one of the security officers asked if Appellant had any weapons in his truck, he initially said "no."[131] But moments later, and before AFOSI arrived and anyone had begun to search his vehicle, he requested to use the bathroom and asked the same security officer if they were "going to take [his] guns."[132] When the security officer asked if Appellant had any firearms in his truck, he answered that he had a rifle and a pistol.

Had the authorities conducting the search discovered the weapons and ammunition before Appellant corrected his earlier false statement, then that could be a different scenario than the one before us. Appellant lied because he knew he had the items in his truck and did not want to be caught with them. At his guilty plea he stated, "I thought if I told them I didn't have any weapons, he was just gonna like leave my vehicle alone."[133] But when Appellant realized that a search was likely to discover the items, he changed his mind. While this is a more serious matter than the lie concerning the improper check-out to his gunnery sergeant, and still merits punishment, confinement for 24 months is still an inappropriate sentence for such behavior. Because this criminal misconduct strikes us as more appropriate for a special court-martial, we find that an appropriate segmented sentence is no more than 12 months' confinement.

We now turn to the fraudulent enlistment. Appellant lied on his enlistment paperwork for entry into the Marine Corps. He lied when he failed to disclose that he had been arrested, suspended from school, and fired from a job. When NCIS special agents reviewed Appellant's Official Military Personnel File [OMPF], they discovered a handwritten comment from a medical examiner's Report of Medical History indicating Appellant had been arrested when he was 15 years old for resisting arrest and assault on a police officer. No further information is available in the record about this incident or the circumstances of his being suspended from school or fired from a job. During the providence inquiry, Appellant acknowledged he had lied about all three occurrences and asserted—without challenge from the Government—that only the juvenile arrest would have required a waiver in order for him to enlist. Appellant also lied on a different enlistment form when he failed to

---

[131] Def. Ex. A at 2.

[132] *Id.*

[133] R. at 210.

disclose that he was rejected by another branch for enlistment. Appellant also made an unchallenged assertion that this would not have required a waiver.

Fraudulent enlistment is, of course, very serious, and the Navy and Marine Corps must be able to honestly evaluate those whom it accepts for enlistment and entry-level training. While it is irrelevant for a guilty finding that the omission is not about something that is an absolute bar to service, or would require a waiver[134]—or as in the case of three of these four omissions, not even require a waiver—it is something that should be considered in arriving at a legally appropriate sentence. Here, Appellant pleaded guilty to a particularly un-aggravated charge of fraudulent enlistment. Only one of the omissions (the arrest) even required a waiver, and the information that Appellant was arrested as a juvenile appeared to have been hiding in plain sight in his OMPF. Appellant received the maximum punishment authorized by the statute and the military judge had no discretion in the matter under the terms of the plea agreement. Much like the false official statement Appellant made to his gunnery sergeant, we find that an appropriate segmented sentence is no more than 30 days' confinement.

### b. Possession of the switches

We finally turn to the segmented sentence of 36 months' confinement for the possession of the two switches. The switches were discovered by law enforcement agents conducting a consent search of Appellant's room at his parent's home in Nebraska. His father opened the safe where one of the switches was stored and the other was in a toolbox in the same closet. The devices were not attached to any weapons. There was no evidence they were ever used in connection with any type of misconduct.

The range of 24 to 36 months' confinement was set by the terms of the plea agreement. During pre-sentencing argument, the Government requested the maximum confinement of 36 months on this specification, but did not provide any justification. The trial counsel focused on Appellant's lack of integrity for the various false statements he had made, whether in enlisting or to his gunnery sergeant or to the Offutt AFB security officer.

In presentencing argument, the Defense only addressed a single overall maximum confinement and requested no more than 24 months. The trial defense counsel [TDC] referenced Appellant's tragic childhood circumstances. Appellant was the son of Iraqi immigrants who "beat, abused, and neglected

---

[134] *United States v. Watson*, 71 M.J. 54, 58 (C.A.A.F. 2012).

their children"[135] requiring state intervention to place Appellant in a series of foster homes, eventually being split-up from his brother and sister. Appellant's abuse and neglect continued in the "over 30"[136] foster homes in which he was placed. Appellant's older brother was murdered with a shotgun. Eventually, when he was sixteen, Appellant was placed in a home with his eventual "parents" in Nebraska, and was no longer in abusive situations. He played sports, worked as a farm hand, and grew to enjoy firearms, prompting his desire to become a Marine.

In Appellant's unsworn statement, he briefly touched on some of the racial bigotry he had experienced in his life, being Iraqi and having a Muslim sounding last name.[137] Unfortunately, some of that continued after he became a Marine, to include name-calling and once finding raw bacon on his rack.[138]

As evidence, the Defense presented the statement of the Offutt AFB security officer, a letter from Appellant's adoptive mother, numerous photos of Appellant in childhood and in the Marine Corps, and the series of text messages between Appellant and the young woman he was going to go meet on base when he was apprehended. The Government's exhibits consisted of an NCIS summary of a statement from a local gun store owner indicating Appellant knew that bump stocks had been declared illegal; a statement from the Offutt AFB gate guard who first made contact with Appellant (describing him as "compliant"[139]); the results of the OMPF review by NCIS; documents concerning his nonjudicial punishment for theft of gear from another Marine during initial training; the stipulation of fact; and the statement from the Marine who drove Appellant to the airport that recounts Appellant's purported threats against the battalion should he receive "more negative paperwork" for failing to check out properly. The Government presented real evidence in the form of various items seized from Appellant: two rifles, a pistol, the bump stock, a pistol frame and some magazines, and the suspected silencer (that was actually a toy).

Appellant presented testimony from his sister, a former Marine friend from Nebraska with whom he served, a close high school friend, and his

---

[135] R. at 315.

[136] Def. Ex. B at 2.

[137] *See* R. at 272. Appellant is not actually Muslim.

[138] R. at 260.

[139] Pros. Ex. 2 at 2.

mother. The sum of the testimony described Appellant as having a very troubled childhood, but rising above that to develop a love of the Marine Corps, and enthusiastically being part of the rural Nebraska "gun culture" where gun ownership, sport shooting, and hunting are common. There was limited cross-examination. The Government presented no witnesses.

Finally, Appellant gave an unsworn statement. He explained that he intended to surrender the bump stock the upcoming Monday at the local police station and had plans to go there to obtain a concealed carry permit. He placed the bump stock in the lock box in his truck, but law enforcement seized it three days before he was planning to surrender it. Appellant explained in great detail how the bump stock was not designed to fit either of the rifles that were seized. He also recounted his very troubled childhood at the hands of his own abusive biological parents, various sets of abusive foster parents, and in different group homes for children without parents. He explained that his statements to his Marine friend who drove him to the airport—that were construed as threats—were in jest and were reciprocated. Appellant expressed remorse, took responsibility, and apologized to the Marine Corps and his family.

For this segmented portion, or for any part of the sentence, unitary or segmented, it is appropriate to be able to apply pre-sentencing evidence, from either party, holistically when evaluating a sentence for appropriateness. Unless obviously specific to a certain charge or specification, Defense evidence in mitigation is not cabined within a certain portion of the sentence, whether segmented or unitary. All of the evidence is evaluated and is taken into consideration for each and every specification as it contributed to either the segmented portion or the unitary portion of the sentence.

Here, we are also mindful that the plea agreement that arrived at a range of 24 to 36 months' confinement for the possession of the switches was also the same plea agreement that arrived at (1) 24 months for the false official statement to the gunnery sergeant; (2) 24 months for the false official statement to the Offutt AFB security officer; and (3) 24 months for the fraudulent enlistment. We found all of these to be inappropriate sentences, and by significant margins. We do so again with the 36 months' confinement for the switches.

The Government never tethered the range of confinement to any rationale. Ordinarily, in crimes with which judges of this Court have familiarity—borrowing from one of the *Winckelman* prongs—we can evaluate a legally appropriate sentence without some sort of guidepost from the Government. But here, the only spectrum discussed is the maximum punishment, and only in the context of the military judge verifying with the parties what the maximum punishment actually was. Initially, the military judge calculated

ten years' confinement for each of the Article 134 offenses, but the trial counsel said that under the "federal sentencing guidelines"[140] the Government considered the two specifications [the bump stock and the switches] "would fall under one max punishment and then be adjusted based on the number of firearms."[141] So, under the Government's rationale, the maximum confinement for possessing the switches was not ten years, but only five. In addition, and of some concern, in the plea agreement the maximum statutory confinement listed for each specification was not ten years, or even under the Government's theory, as five years. It was listed as "24-40 months."[142] When the military judge inquired about the fact that the "plea agreement indicates the wrong maximum confinement"[143] TDC replied that he saw no prejudice.

But based on the entire record it is difficult to discern why the 36 months' confinement is appropriate. We recognize Appellant signed a plea agreement with an overall range of 24 to 36 months' confinement and we also recognize that part of the consideration was the withdrawing and dismissing of other charges and specifications. But our duty here is to ensure "justice is done and that the accused gets the punishment he deserves."[144] We must conduct "individualized consideration of the particular accused on the basis of the nature and seriousness of the offense and the character of the offender."[145] Possession of a machine gun, in this case switches that convert a semi-automatic pistol into one that shoots automatically, is a felony and an offense not to be taken lightly. We note that, given the maximum confinement authorized for the offense [based on the Government's arguments to the military judge and her acceptance of those arguments] was five years, and Appellant received 60 percent of that. But on its face, the Record demonstrates no reason as to why that was appropriate and the Government made no arguments in support of such a sentence. After reviewing the entire record, to include Appellant's particular character and the non-violent possessory nature of this offense, we believe, at most, an appropriate segmented sentence for the possession of the two switches is 24 months' confinement.

---

[140] R. at 219. The trial counsel mentioned the sentencing guidelines, but there was no further discussion of them from either party or the military judge.

[141] *Id.*

[142] App. Ex. X at 7.

[143] R. at 224–25.

[144] *Healy*, 26 M.J. at 395.

[145] *Snelling*, 14 M.J. at 268 (internal quotation omitted).

*5. Appropriate unitary sentence*

We have found the appropriate segmented sentences to be 30 days' confinement for Charge IV, Specification 1 (false official statement to the gunnery sergeant); 12 months' confinement for Charge IV, Specification 2 (false official statement to the Offutt AFB security officer); 30 days' confinement for the sole specification under Charge III (fraudulent enlistment); and 24 months' confinement for Charge VII, Specification 2 (possession of the switches). We now review the unitary portion of the sentence for sentence appropriateness. The unitary sentence consisted of total forfeiture of pay, reduction to E-1, and a bad-conduct discharge. Again, reviewing this sentence with the "individualized consideration of the particular accused" based on "the nature and seriousness of the offense and the character of the offender," we find that a unitary punishment consisting of total forfeiture of pay, reduction to E-1, and a bad-conduct discharge to be appropriate.

*6. Appellant's appropriate sentence*

We find it is appropriate that Appellant's confinement be served concurrently. His affirmed sentence is a total of 24 months' confinement, total forfeiture of pay, reduction to E-1, and a bad-conduct discharge.

## III. CONCLUSION

After careful consideration of the entire record of trial and the briefs and excellent oral argument from both appellate counsel, we **SET ASIDE** and **DISMISS** Charge VII, Specification 1. All other findings are approved as correct in law and fact and without error materially prejudicial to Appellant's rights.[146] After reassessing the sentence and also determining an appropriate sentence for the remaining findings, the remaining findings and sentence as reassessed and determined to be appropriate are **AFFIRMED.**

Chief Judge MONAHAN and Judge DEERWESTER concur.

---

[146] Articles 59, 66, UCMJ.



FOR THE COURT:

RODGER A. DREW, JR.
Clerk of Court